UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Roy Young,                              )
                                        )
    Plaintiff,                         )
                                        )
v.                                      )    No. 17 CV 50105
                                        )    Magistrate Judge Iain D. Johnston
Nancy A. Berryhill, Acting              )
Commissioner of Social Security,[1]     )
                                        )
    Defendant.                         )

## **MEMORANDUM OPINION AND ORDER**

As this Court has repeatedly stated, Social Security applicants may not be sympathetic, likeable or even entirely credible. Applicants can have criminal histories, drug abuse issues, and mental health concerns, which can all interrelate. But benefits cannot be denied because an applicant is unsympathetic, unlikeable and not entirely credible. Administrative law judges must follow fundamental statutory, regulatory and case-law requirements to support their decisions to deny benefits. And the Court cannot affirm the denial of benefits when ALJs err in these ways, even when the Court's own independent review of the record reveals fundamental weaknesses as to the merits of the applicant's claim. *See Pulley v. Berryhill*, 295 F. Supp. 3d 899 (N.D. Ill. 2018); *Largent v. Colvin*, 14 CV 50030, 2016 U.S. Dist. LEXIS 583, at *1 (N.D. Ill. Jan. 5, 2016); *Booth v. Colvin*, No. 14 CV 50347, 2016 U.S. Dist. LEXIS 82754, at *2 (N.D. Ill. June 27, 2016); *Swagger v. Colvin*, 14 CV 50020, 2015 U.S. Dist. LEXIS 151502, at *2 (N.D. Ill. Nov. 4, 2015); *Koelling v. Colvin*, No. 14 CV 50018, 2015 U.S. Dist. LEXIS 140754, at *1-2 (N.D. Ill. Oct. 16, 2015). By remanding this case, the Court in no way endorses plaintiff's

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

character or actions. Instead, the Court simply finds that the ALJ made legal errors that require remand.

In January 2014, a few days after being released from prison, plaintiff Roy Young applied for supplemental security income. He was then 47 years old and had spent the last eight years in prison. He alleged that he was disabled based on mental illnesses (depression and anxiety) and respiratory problems (asthma, shortness of breath). In this appeal, he raises two arguments why the administrative law judge ("ALJ") erred in finding him not disabled. The first relates to the mental illnesses, the second to the respiratory problems. Because the Court finds that only the first argument warrants a remand, the Court will focus on that argument.

Plaintiff argues that his mental health problems existed from an early age and have been severe, causing hallucinations and violent behavior, among other things. He claims that these problems gravely affected the trajectory of his life. The first paragraph from his opening brief summarizes this history as follows:

> Plaintiff has a longstanding history of mental illness; he told his counselor at Rosecrance that he first attempted suicide at the age of ten. He has consistently reported to Rosecrance that he has homicidal and suicidal thoughts. Not surprisingly, he also has a history of reckless behavior: gang activity since a young age, cocaine use, and other criminal activities.

Dkt. #12 at 1. This summary takes a wide chronological perspective, relying principally on plaintiff's recollections, as there are no available medical records from before, or even during, his recent prison term. However, after being released from prison, plaintiff was treated at Rosecrance. One of the early progress notes described his condition as follows:

> Client reports that he was recently released from prison on 1/21/14 after serving 8 years. He states that he was incarcerated for sexual assault. He states that he was prescribed Klonopin and Sinequin while in jail. He states that he has never been hospitalized for mental health issues or had outpatient services. He reports that he is experiencing depressed mood, anxiety, and not wanting to be around people. He reports that he has been in jail on drug and battery charges. He reports that he

2

doesn't have any supports in the area and is currently homeless. Client reports a hx of cocaine and alcohol abuse. Client reports having SI but denies any thoughts. He states that he tried to hang himself in the past and cut his wrists. Client reports having HI on occasion but denies any plans.[2] He states that he has been aggressive towards other people in the past. Client placed on priority for 1/24/14.

R. 286. At these initial evaluations, he was diagnosed with major depressive disorder, recurrent, severe with psychotic features; anxiety disorder NOS; alcohol dependence; and cocaine dependence. His GAF was rated as 48. R. 302-03. Thereafter, plaintiff received treatment at Rosecrance for these problems, including group therapy and medications, although there were some significant gaps in treatment. During this roughly two-year period, his GAF score remained in the 45 to 48 range. Plaintiff's two core arguments for remand are that the ALJ downplayed the severity of his problems and relied on layperson intuitions in interpreting the medical evidence.

In her written decision, the ALJ found that plaintiff's problems were less serious than he portrayed them. In the five-step evaluation, the ALJ found at Step Two that plaintiff had the severe impairments of major depressive disorder and antisocial personality disorder. However, at Step Three, the ALJ concluded that plaintiff did not meet a mental health listing.[3] In the residual functional capacity analysis, the ALJ found that plaintiff could do light work if he were limited to simple work-related decisions and only had occasional contact with coworkers and supervisors. The ALJ found that plaintiff was not credible for three reasons. First, he had not followed treatment recommendations. He had "significant gaps" in treatment, was not "entirely compliant" in taking medications, and "inconsistently attended anger management group therapy sessions." R. 24. According to the ALJ, when plaintiff was compliant, his symptoms "stabilized or improved." *Id.* Second, plaintiff's sporadic lifetime work history showed that his medical problems may not have been the real reason for his "continuing unemployment." *Id.* Third,

---

[2] Based on other notes in the record, "SI" and "HI" appear to be referring to suicidal and homicidal ideations.
[3] The ALJ found that plaintiff had only mild limitations in activities of daily living, and moderate limitations in both social functioning and concentration, with no episodes of decompensation.

plaintiff's daily activities—specifically, that "he prepares his own means, does his own laundry and grocery shopping, and helps clean up around the house"—were not as limited as "one would expect" given his allegations. *Id.*

After considering these arguments, the Court agrees with plaintiff that the ALJ's decision, on the whole, failed to meaningfully confront all the relevant psychiatric evidence. The ALJ's analysis ignored or glossed over several important topics.

One area that was not explored was plaintiff's alcohol and drug abuse. Rosecrance diagnosed plaintiff with alcohol and cocaine dependence. Plaintiff repeatedly told doctors that he had problems with drug and alcohol problems. *See, e.g.,* R. 293 ("Cl reports abuse of substances in the past. He stopped using because he went to prison. He used cocaine, speed, alcohol, 'whatever.'").[4] Although the ALJ briefly mentioned these problems, the ALJ never indicated how she evaluated them. For one thing, she did not conduct a materiality analysis.[5] Also, she did not consider the possibility that these addictions were caused by, and therefore evidence of, the underlying mental illnesses. One medical report noted the following: "[Plaintiff] reports that whenever he gets depressed, his alcohol intake, as well as cocaine use gets worse." R. 680. The Seventh Circuit has faulted ALJs for not considering these possibilities and for not attempting to "disentangle" the mental illness and substance abuse. *See, e.g., Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms"); *Harlin v. Astrue*, 424 Fed. App. 564, 568 (7th Cir. 2010) ("we believe that the ALJ here has not adequately disentangled the

---

[4] The day after the hearing, plaintiff reported to the emergency room and told doctors that he "was out drinking and smoking crack." R. 698. This fact comes from Exhibit 14F, which was not provided to the ALJ but was later submitted to the Appeals Council. However, there is much other evidence in the record referencing plaintiff's drug and alcohol abuse over the years.

[5] An ALJ must determine whether the claimant would still be found disabled "if he or she stopped using drugs or alcohol." SSR 13-2p.

effects of Harlin's drug abuse from those of her other impairments.").[6] The Court recognizes that this analysis is often not an easy task, but the ALJ still must make some effort to confront this issue head-on. On remand, a medical expert should be called to address these issues.

Another issue that received little attention was plaintiff's ongoing interpersonal difficulties. Plaintiff testified that he got into fights or near-fights with others, including his own brother and a stranger outside his sister's door only two days before the hearing. R. 80-81. Plaintiff testified that he did not have any friends because he "can't even get along with them." R. 80. In summarizing plaintiff's testimony, the ALJ did not mention these facts. Plaintiff also had, as the Government characterizes it, a "lengthy" criminal history. Dkt. #15 at 2. Although the parties have not described the details of this history, there are suggestions that some of it arose from conflicts with others. During his recent, eight-year incarceration, plaintiff was placed in isolation once or twice for fighting. R. 21. Plaintiff was diagnosed by Rosecrance as having antisocial personality disorder. According to the Mayo Clinic website, people with antisocial personality disorder "tend to antagonize, manipulate or treat others harshly or with callous indifference." The record also states in multiple places that plaintiff had "homicidal ideations." *See, e.g.*, R. 293. The ALJ did not discuss this evidence in any detail. It is true that the ALJ concluded that plaintiff had moderate problems in social functioning and limited plaintiff to jobs with only occasional contact with others. But the ALJ provided no explanation for why she reached these conclusions as opposed to finding that plaintiff's limitations in social interaction were marked. The ALJ's analysis consisted of the following sentence: "Although the claimant has alleged difficulties in getting along with others, he manages to go out to the store and to

---

[6] The Court again expresses its concerns regarding the interpretation of the scientific literature cited in *Kangail* to support its propositions as well as the extremely difficult position its holding places ALJs in. *Pulley*, 295 F. Supp. 3d at 901 n. 2; *Lewis v. Colvin*, 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, at *11 (N.D. Ill. Aug. 30, 2016).

group therapy sessions, demonstrating some ability to interact and relate appropriately around others." R. 19. This explanation does not acknowledge the evidence summarized above.

The ALJ also failed to develop the record regarding plaintiff's medications. The ALJ only briefly noted that *plaintiff testified that* he "takes an antipsychotic, Seroquel, and an antidepressant, Lexpro." R. 21. But this information is based on plaintiff's recollections. The Court notes that there are references in the record to other drugs possibly being prescribed. So, at this point, it is unclear to the Court what those medications were, how many plaintiff was taking, and what conditions they were designed to treat. This is another issue on which expert testimony could provide assistance.

Turning next to those issues the ALJ chose to consider, the Court finds that several of her rationales were vague or incomplete. Consider plaintiff's daily activities. The ALJ stated as follows: "While the claimant reported that he lives with his parents, he prepares his own meals, does his own laundry and grocery shopping, and helps clean up around the house (4E; HT)."[7] But the ALJ's description leaves out several qualifications. At the hearing, plaintiff testified that he lived with his two elderly parents and would "try" to do cleaning tasks but that it "takes a while." R. 77. As for the laundry, he stated that he would take his clothes to the basement and "leave [them] in the washer for, I don't know, a day or two or something." R. 77. This leisurely approach to washing clothes does not fit with the picture of a person tidily checking off tasks on his chore to-do list. Plus, it should be noted that these few chores were done during the day when plaintiff was otherwise mostly "sit[ting] on the bed." *Id.* As for bathing, plaintiff told Rosecrance providers that he was having trouble doing it consistently. R. 579. The ALJ ignored these facts in assessing plaintiff's daily activities.

---

[7] The ALJ mentioned this rationale twice, suggesting it was an important part of the decision.

Aside from the daily activities, the ALJ's remaining two credibility rationales were also not fully developed. First, the ALJ faulted plaintiff for not consistently following doctor recommendations. This was identified as the "foremost" of the three rationales. However, as the Seventh Circuit has made clear, an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Craft*, 539 F.3d at 679 ("although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine."). The ALJ failed to investigate these possible explanations. Plaintiff had just been released from prison, and apparently had little financial assets. He stated that he had trouble getting the bus to get to his therapy sessions. The ALJ also failed to consider that plaintiff's psychiatric illnesses may have affected his ability to abide by treatment recommendations. *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for lack of medical care before drawing a negative inference").

The other remaining credibility rationale was that plaintiff "worked only sporadically" before filing for disability benefits. This statement is true. Plaintiff's lifetime earnings indicate that he never stayed at a job for any sustained period and had large gaps in employment, perhaps

related to his criminal and gang history. Also, as the ALJ noted, he was in prison the eight years before filing his application. But the Court fails to understand why these facts undermine plaintiff's claim. His theory is that his psychiatric illnesses began in childhood and affected him over his entire life. Under this view, the sporadic work history indirectly *supports* his claim. The ALJ presumably believed that the psychiatric illnesses only emerged later in life. While possible, the ALJ cited to no evidence to support this theory.

The ALJ devoted the longest discussion of the medical evidence to the issue of plaintiff's GAF scores. Here is the analysis:

> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by 20 CFR 416.927(c) and SSR 06-03p. The record, as outlined above, contains GAF scores that range from 45 to 48. The undersigned collectively grants little weight to these scores. A GAF score represents the subjective opinion of one clinician, on one day, at a single point in time. It was not intended for adjudicative purposes or for use in litigation because the score may vary from day-to-day, time-to-time, and from one evaluator to another. Also, a GAF rating may indicate problems that do not necessarily relate to holding a job. In addition, the raw numeric score should be supported by a narrative detailing the rationale for the findings of the evaluator. Without that narrative, unless supported by other medical evidence, a GAF score standing alone is not considered to reflect accurately psychological constraints on the claimant's ability to work. For all these reasons, the undersigned gives considerably less weight to these GAF scores than to the bulk of other, more convincing evidence described above.

R. 25. Although some of these concerns are valid, others seem less relevant under the facts of this case. The complaint that GAF scores are one-time snapshots seems less applicable here given that apparently *all* of plaintiff's GAF scores were the same narrow 45-to-48 range. This is thus not a case where a claimant has cherry-picked a few low scores and ignored other higher scores. The ALJ complains that the GAF scores were rendered without an accompanying "narrative rationale," but this overlooks the fact that these scores were included in a longer

medical report with other statements about plaintiff's condition.[8] Even if the GAF scores are ignored, underlying medical records and diagnoses about plaintiff's condition exist that support a claim for benefits that the ALJ failed to address. In short, by considering all this evidence only through the lens of the GAF scores, the ALJ essentially threw the baby out with the bathwater.

In sum, the Court finds that this case must be remanded because the ALJ did not fully consider several important evidentiary strands. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence contrary to his conclusion). But a related and compounding problem is that the ALJ analyzed this evidence without the assistance of an expert opinion. The ALJ did not call an expert at the hearing. No consultative psychological examination was ordered. It is true that two Agency psychologists provided opinions, but as plaintiff argues, these opinions were incomplete because they were rendered early in the process and rested on the conclusion that plaintiff's problems were temporary, caused only by the readjustment period after getting out of prison.[9] However, as plaintiff notes, these psychologists did not consider the later treatment records. They also did not give any weight to the fact that plaintiff was prescribed psychiatric medications while in prison and stated that his symptoms existed for most of his life. *See, e.g.* R. 335 ("He has had depression for most of his adult life, but has found some relief using doxepin."). In any event, the ALJ stated that she was not relying on the Agency opinions because she had concluded that plaintiff was "more mentally limited" than

---

[8] *See, e.g.,* R. 292 ("Cl was restless on his seat and rubbing his hands constantly, picking his nails and eating them."); R. 301 (cluster of psychotic symptoms included auditory hallucinations, flattened effect, lack of motivation, neglect of self-care skills and hygiene); *id.* ("Defiant Cluster: FIRE SETTING AT YOUNG AGE 11 OR 10 YEARS OLD. Set the dog in fire. It was somebody else's fire. I also set a chicken in fire. Cl reports not feeling remorse after killing them."); R. 403 ("Roy reports 'I hear voices. I hear people talking. I stay depressed all the time—stressing, anxiety, especially when I have people talking—because I am a registered sex offender and everyone is always talking, I don't have any friends' 'the voices keep[] telling me to do stuff to hurt myself and other people[]' ").

[9] *See* R. 95 ("It is reasonable for this claimant would have some depressive symptoms, secondary to his adjustment to life outside of prison and dealing with others within his community/physical issues as well as financial concerns and general life circumstances."); R. 104 ("It appears that the claimant's emotional distress is a reasonable reaction to various situational stressors, including his recent release from prison.").

9

these doctors had concluded. But this means that the ALJ's analysis of the medical records was based on her own layperson intuitions. In the terminology of disability litigation, the ALJ was playing doctor. *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) (remanding because the ALJ improperly "played doctor"). The ALJ should call a medical expert to address these issues.

Having concluded that a remand is warranted based on the first argument, the Court will briefly address plaintiff's second major argument. In his opening brief, plaintiff argued that the ALJ improperly evaluated whether he met the respiratory listings—*i.e.* 3.02 (chronic pulmonary insufficiency) and 3.03 (asthma). In its response brief, the Government argued that plaintiff had failed to show that he could meet all the specific technical requirements of these listings, which included having expiratory test results in certain ranges. The Government argued that the plaintiff waived any listings argument by not discussing these requirements. This Court agrees. In his reply, plaintiff did not respond to all these arguments, thus further waiving this argument.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: September 10, 2018            By: _____
                                         Iain D. Johnston
                                         United States Magistrate Judge

10